# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

DALE BRYANT,

        Plaintiff,                        Hon.

vs.

                                     Case No.

CITY OF TAYLOR, a municipal corporation,
Officer MAX DORFLINGER, a Taylor Police      JURY TRIAL DEMANDED
Officer, in his individual capacity, Officer
AARON LAYNE, a Taylor Police Officer, in his
individual capacity, and Animal Control Officer
LANNY HALL, Taylor Animal Control Officer, in his
individual capacity,

        Defendants.

_____/

Syeda F. Davidson (P72801)
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6814
sdavidson@aclumich.org
mfancher@aclumich.org
dkorobkin@aclumich.org

Attorneys for Plaintiff

Jennifer M. Grieco (P55501)
Cooperating Attorney, American Civil
  Liberties Union Fund of Michigan
Altior Law, P.C.
401 S. Old Woodward Ave.
Ste. 460
Birmingham, MI 48009
(248) 372-9884
jgrieco@altiorlaw.com

Attorney for Plaintiff

## **COMPLAINT**

This is a federal civil rights lawsuit challenging the unlawful seizure of property belonging to a person with a disability by the City of Taylor and its employees in violation of the Fourth Amendment to the United States Constitution as enforceable through 42 U.S.C. § 1983. Plaintiff seeks relief in the form of damages, and an injunction. He complains as follows:

## INTRODUCTION

1.      Dale Bryant is the plaintiff in this case. He is a Black man whose legs were amputated after he was shot many years ago, and he must use a wheelchair that allows him to lie on his front while using his arms to power the wheels.

2.      Mr. Bryant's troubles began when his dog, King, a purebred German Shepherd, pulled a lead line into his crate, entangled his right hind leg, and created a risk of fracture.

3.      When Mr. Bryant was unable to free King, he called his sister, Ms. Kim Bryant, for help. She agreed to assist, but she lived some distance away, so Mr. Bryant had to wait. As he waited, King became more distressed and Mr. Bryant was concerned that King might break his leg before his sister arrived, so he called 9-1-1 for help.

4.      Notwithstanding King's predicament and Mr. Bryant's distress, this case is about more than a man and his dog. It is about a Black, disabled man who lives in a city with a police department notorious for acts of hostility toward Black

persons and a policy that disrespects and offends disabled persons. This case is about a city that fails to employ emergency response personnel with the knowledge, training, and judgment needed to not only lend a helping hand during non-criminal crises like that faced by Mr. Bryant and his pet, but to also do so in a way that protects the rights of citizens.

5.     The defendant officers who responded to the 9-1-1 call are employed by the Taylor, Michigan Police Department. It is a troubled department that was the subject of a report by the ACLU of Michigan to the U.S. Department of Justice, which highlighted not only numerous complaints by citizens of police use of excessive force, suspected racial discrimination, and callous disregard of civil rights, but also practices designed to prevent litigation challenges to police misconduct. The ACLU report highlights incidents of summarily dispensing excessive punishment for behavior that police officers perceive as a challenge to their authority and the escalation of tense encounters.

6.     Evidence of the police department's culture of insensitivity and, in some cases, cruelty, is apparent from a police department policy that warns officers to be suspicious of people who have disabilities, cautioning officers that *"persons with disabilities often rely on their disability to attempt to manipulate and control their environment."* The same policies warn that mobility-impaired suspects *"may*

*be handicapped, but they are not stupid, and expect you to empathize with their*

*overt condition."*

7.      After officers who responded to Mr. Bryant's emergency call freed King, in the spirit of the police department's policy concerning persons with disabilities, they wrongly accused Mr. Bryant of animal cruelty and told him that he should not have a dog like this "in his condition."

8.      Thereafter, the City of Taylor kept King in its animal shelter for nearly four months while charging Mr. Bryant daily kennel fees. During the proceedings on the animal cruelty charge, Defendants admitted that Mr. Bryant had not committed animal cruelty.

**JURISDICTION AND VENUE**

9.      Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343 because this is a civil action seeking redress for the deprivation of rights secured by the United States Constitution. Supplemental jurisdiction over claims arising under state law is proper under 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims asserted occurred in Wayne County, which is within the Eastern District of Michigan.

## PARTIES

11.     Plaintiff Dale Bryant is a Black man who was shot by an intruder in his apartment building over forty years ago. He survived the shooting, but both of his legs were amputated as a result of his injuries. Mr. Bryant called Defendants for help when his dog's hind leg became tangled in its lead line. In response, his dog was taken by the responding officers.

12.     Defendant City of Taylor is a municipal corporation organized under the laws of the State of Michigan. The Taylor Police Department and Animal Shelter are divisions or departments of the City of Taylor.

13.     Defendant Max Dorflinger is, or was at all times relevant to this Complaint, a City of Taylor police officer. Officer Dorflinger is being sued in his individual capacity.

14.     Defendant Aaron Layne is, or was at all times relevant to this Complaint, a City of Taylor police officer. Officer Layne is being sued in his individual capacity.

15.     Defendant Lanny Hall is, or was at all times relevant to this Complaint, an Animal Control Officer for the City of Taylor. ACO Hall is being sued in his individual capacity.

## FACTS

**Mr. Bryant and King**

16.    Mr. Bryant lives alone in a house in the City of Taylor. Because both of his legs have been amputated, he gets around his house by using a wheelchair that allows him to lie face down while he uses his arms to push the wheels.

17.    In early 2021, Mr. Bryant adopted a German Shepherd puppy, whom he named King. King was just six weeks old when Mr. Bryant adopted him. Mr. Bryant intended that King would eventually become a service dog, but the two also enjoy each other's companionship.

18.    Because Mr. Bryant cannot walk and because his property is not fenced in, King is housetrained. This means that rather than having to be let outside to relieve himself, King is trained to do so in a specific area of the house. Mr. Bryant then immediately cleans up after King.

19.    Mr. Bryant uses a long lead line that he attaches to the front of his home, which gives King more freedom outside so that King can get exercise. Mr. Bryant's family assists by taking King on walks and to the veterinarian on a regular basis.

20.    One common method of housetraining puppies is by crate training. Crate training is the process of teaching a pet to accept a cage as its own safe, familiar location. It helps pet owners housetrain puppies because the dog will not

6

want to soil its own space. It also helps to keep puppies out of mischief when the owner is not around to supervise them, and helps to provide them with a safe, comfortable retreat. Dogs enjoy the comfort and security of their crates.

21.     Mr. Bryant crate trained King so that King has a safe, secure space to call his own, and so that King only relieves himself outside or in designated places in the home, which Mr. Bryant immediately cleans.

22.     King is cared for and well-loved by Mr. Bryant and his family. They are diligent about his veterinary appointments and daily care.

**King pulls his lead line into his crate and tangles his hind leg in it**

23.     On the evening of April 15, 2021, Mr. Bryant fed King, gave him fresh water, let him relieve himself, and cleaned up. King then retired to his crate while Mr. Bryant went to the living room to watch television for the evening.

24.     Mr. Bryant had not been in the living room for long when he heard a noise that sounded like King flopping around as though he was playing. Mr. Bryant decided to investigate the noise to make sure King was not hurt.

25.     The lead line that Mr. Bryant used at the time was a small red chain that was outside of King's crate but attached to the bottom of it. When Mr. Bryant made his way over to King, King started crying and sat up. Mr. Bryant then saw that King had pulled the entire lead line into the crate and completely tangled his hind legs in it.

26.    Mr. Bryant tried to free King's leg, but the longer that King was stuck, the more distressed he became. This, in turn, caused King to move in such a way that caused him to become even more tangled. During the commotion and King's escalating stress, King had a bowel movement and rolled around in his feces while he was struggling to free himself.

27.    Mr. Bryant picked up a knife, thinking he could cut the lead line, but King was so tangled and panicking so much that Mr. Bryant quickly determined that was not a good idea. He called Ms. Kim Bryant (his sister), and asked her to come with wire cutters to help. She agreed but lived at least twenty minutes away.

28.    While Mr. Bryant waited for his sister, he began to worry that King was going to break his leg before she arrived.

29.    Left with no other choice and afraid for King, Mr. Bryant dialed 9-1-1 and asked for help.

**Officers arrive at Mr. Bryant's home**

30.    Officers Dorflinger and Layne arrived at Mr. Bryant's home in response to his request for help. They approached the house and looked through the window at the top of the door. Upon seeing Mr. Bryant through the window, one officer exclaimed, "Oh my god. This guy is in a wheelchair laying straight down!" The other officer laughed and responded, "Oh, shit!" The first officer

continued, "I've never seen something like this before." Mr. Bryant then opened

the door.

31.   The officers entered the home and saw King. Immediately, one officer

contacted the dispatcher to request that Animal Control Officer Lanny Hall ("ACO

Hall") be sent to the home.

32.   During the time that Officers Dorflinger and Layne were at the home,

Officer Dorflinger commented that Mr. Bryant should not own a dog because of

his disability. Further, even though it was only King's hind legs that were tangled,

Officer Dorflinger accused Mr. Bryant of trying to "strangle" King.

33.   Officers Dorflinger and Layne then saw the feces in the crate. Without

gathering any information from Mr. Bryant, they declared that the feces was "not

all from right now," and that they were "going to talk about this" with Mr. Bryant.

34.   The officers did not talk about anything with Mr. Bryant. Instead, they

freed King from the lead line, concluded with no basis that the feces was "at least a

week" old, and told Mr. Bryant that animal control was coming to take King. The

officers did not listen to Mr. Bryant when he tried to address their concerns, and

they did not give him an opportunity to explain.

35.   The officers demonstrated a callous – if not cruel – approach to Mr.

Bryant's distress by jumping to offensive and incorrect conclusions, and then

escalating an already-tense encounter by taking his pet without the benefit of an assessment by animal specialists.

**Defendants impound King while trying to intimidate Mr. Bryant and his sister**

36.     ACO Hall arrived at Mr. Bryant's home with the animal control vehicle. While the officers were putting King in the vehicle, Mr. Bryant's sister (Ms. Kim Bryant) arrived. Mr. Bryant, frustrated and upset that the people he called to help him were instead taking his pet, was inside the home.

37.     Ms. Bryant stood outside of the house when ACO Hall approached her with something resembling a book of receipts. Without any explanation, ACO Hall thrust the book at her and said, "Sign this." When Ms. Bryant asked what ACO Hall was asking her to sign, he responded that she was signing the dog over to ACO Hall.

38.     Ms. Bryant refused and said that King belonged to Mr. Bryant. By this time, Officer Dorflinger had joined Ms. Bryant and ACO Hall near the front of Mr. Bryant's house. In an effort to defuse the situation, Ms. Bryant offered to take custody of King. ACO Hall responded, "No, this is my dog now."

39.     Ms. Bryant responded that King still belonged to Mr. Bryant, to which ACO Hall responded, "We'll see." Officer Dorflinger then said, "[Mr. Bryant] doesn't need a dog, he can't even take care of himself."

10

40.     ACO Hall then told Ms. Bryant that if she still refused to sign King over to him, Mr. Bryant would face expensive, daily kennel charges while King was impounded. ACO Hall then said, "[Mr. Bryant] can just get another dog," and again added, "This is my dog."

41.     After it became apparent that King would not be voluntarily surrendered to the officers, the officers prepared to leave with King in their custody. However, before they did so, Officer Dorflinger wrote Ms. Bryant a ticket because the tab on her license plate was expired.[1]

42.     Officer Dorflinger wrote in his police report that he ticketed Ms. Bryant because she had blocked the egress of the officers' vehicles, but this was untrue as there was nothing illegal about the way that the vehicle was parked. It was parked along the curb in front of the house next to Mr. Bryant's. As Officer Dorflinger presented Ms. Bryant with the ticket, he revealed that the real reason he had ticketed her was "because of [her] attitude."

---

[1] Ms. Bryant's license plate tab was expired, but these events occurred during the COVID-19 crisis, during which appointments at the Secretary of State for renewals were severely backlogged. Ms. Bryant had an appointment pending, but was forced to schedule it out by three months.

**Defendants keep King despite admitting that there was no animal cruelty**

43.     During the proceedings concerning Mr. Bryant's animal cruelty charges, the City of Taylor confined King at its animal shelter while saddling Mr. Bryant with expensive, daily kennel fees.

44.     Defendants continued to offer to drop all of the charges and waive the fees if Mr. Bryant simply surrendered King to them. ACO Hall did not want to agree to any resolution that allowed for King to be returned to Mr. Bryant.

45.     ACO Hall further admitted during the proceedings that there was no animal cruelty, and that the officers initially had no intention of impounding King. ACO Hall stated that the officers only impounded King because Mr. Bryant was "rude."

46.     ACO Hall then opined that Mr. Bryant's house was "too small" for King, that King was "big and wild," and that Mr. Bryant would not be able to take care of him. ACO Hall suggested that he could find a new dog for Mr. Bryant himself if Mr. Bryant surrendered ownership of King.

47.     Desperately missing King and concerned for King's welfare, Mr. Bryant repeatedly called the animal shelter to ask about King. Eventually, though, they told Mr. Bryant that they could not give him any more information.

48.     Mr. Bryant was distraught about having King taken away from him, and cried about it every day.

49.     By the time that Mr. Bryant's attorney convinced Defendants to return King, dismiss the charges, and waive the nearly $2,000 in kennel fees that had accumulated during the ordeal, Defendants had kept King at the animal shelter for nearly four months.

50.     King had missed Mr. Bryant as well. When Mr. Bryant's other sister, Ms. Sabrina Bryant, came to pick up King from the animal shelter, King was initially hesitant to go with her. But she had brought a blanket belonging to Mr. Bryant to soothe King. Once King sniffed the blanket, he curled up in the backseat of her car and let her take him home to Mr. Bryant.

51.     When King was finally returned to Mr. Bryant, the veterinarian would not even give King his next round of shots because he was too malnourished from the nearly four months in Defendants' care. Mr. Bryant had to work to get King back to a healthy weight so that he could receive his next round of shots.

**Facts Relevant to Municipal Custom, Policy, or Practice**

52.     The City of Taylor maintains customs or policies that encourage its officers to seek out crime where none exists and to be suspicious of people with disabilities. Further, Taylor's ordinances provide its animal control officer with unfettered discretion regarding impounded animals and authorizes exploitative fees for those animals that have been impounded.

53.     The Taylor Police Department maintains an offensive and discriminatory written policy that warns officers to be suspicious of people who have disabilities, cautioning officers that "persons with disabilities often rely on their disability to attempt to manipulate and control their environment."[2] The same policies warn that mobility-impaired suspects "may be handicapped, but they are not stupid, and expect you to empathize with their overt condition."[3]

54.     The City of Taylor has not only issued these policies, it has also failed to train its officers to recognize that treating people with disabilities with suspicion is not appropriate in response to a situation where no crime has been committed and the person who has the disability has instead called for help. The City of Taylor has also failed to train its officers how to understand and identify the needs of people with disabilities and how to provide an appropriate response to such calls.

55.     The Taylor City Code provides that the animal shelter is within the jurisdiction and control of its department of public works, and is to be supervised by an animal control officer who has the authority to impound animals.[4] When the

---

[2] TAYLOR POLICE DEPARTMENT, Policy Number 5.09 (issued May 10, 2019) (emphasis in original).

[3] Id.

[4] TAYLOR, MICH., CODE OF ORDINANCES ART. IV § 6-176.

animal shelter releases an animal to its owner after the animal control officer

impounds it, the owner must pay a pound fee in an amount prescribed by city

council.[5] The City of Taylor authorizes a pound fee of $30 per day and $35 for

each additional day that it keeps an animal from its owner.[6]

56.     The City of Taylor further empowers the Animal Control Officer to

use his judgment to determine whether an impounded animal is "valuable or

otherwise desirable of keeping," allowing him to "dispose of the animal to any

person who will undertake to keep and harbor the animal . . . who shall satisfy the

animal control officer that the person is capable of fulfilling such undertaking.[7]

57.     Imposing fees of $35 per day while requiring that the Animal Control

Officer be satisfied that a person is capable of taking care of an animal all but

guarantees that people whose animals are taken from them will have no choice but

to surrender the animals, especially in an instance where the Animal Control

Officer may find the impounded animal to be valuable.

---

[5] TAYLOR, MICH., CODE OF ORDINANCES ART. IV § 6-180(a)(1).

[6] CITY OF TAYLOR, Fee Schedule, Effective 7/1/21 (Revised 1/04/2022) *available at* https://www.cityoftaylor.com/DocumentCenter/View/10515/7-1-21-Fee-Schedule--Council-Approved--Revised-1-04-22.

[7] TAYLOR, MICH., CODE OF ORDINANCES ART. IV § 6-182.

58.     Taylor police officers have a well-documented history of reacting to a wide range of situations in an overly aggressive, unconstitutional manner. This includes summarily dispensing excessive punishment for behavior that they perceive as a challenge to their authority (such as a person in a traffic stop asking for a reason for the stop) and escalating interactions with people instead of de-escalating tense encounters.[8]

59.     The City of Taylor is aware of their employees' behaviors because a complaint was filed with the Civil Rights Division of the United States Department of Justice, outlining multiple encounters that illustrate the officers' toxic culture of policing.[9]  Many of the events documented within the complaint were publicized in the media long before they were compiled into one document.

60.     Further, the United States Department of Justice Complaint was brought *after* a letter outlining one such encounter was sent to the Taylor Police Department, in which the ACLU of Michigan urged the department to institute policy revisions, re-trainings, and discipline where appropriate.[10] The letter further

---

[8] ACLU OF MICHIGAN, Complaint regarding Civil Rights Violations by the Taylor, Michigan Police Department (Oct. 7, 2021), *available at* https://www.aclumich.org/sites/default/files/field_documents/aclu_complaint_to_doj_re_taylor_with_attachments.pdf.

[9] *Id*.

[10] ACLU OF MICHIGAN, *ACLU of Michigan Urges Taylor Police to Change Policy and Training After Violent Arrest of Calvin Jones* (May 25, 2017),

outlines de-escalation techniques that could be used during many police encounters.

61.     The City of Taylor continues to turn a blind eye to its employees' actions during police encounters. In turn, the City of Taylor's employees continue to employ tactics that escalate already-tense situations, criminalize incidents that are not crimes, and punish people for perceived challenges to their authority.

62.     By allowing its employees to behave in this manner in response to non-criminal emergency calls, in addition to its offensive policies regarding people with disabilities and its troubled history with Black people, the City of Taylor will deter Black people and people with disabilities from contacting 9-1-1 when they have emergencies and need assistance.

### COUNT ONE

**42 U.S.C. § 1983**
**Violation of the Fourth Amendment**
**Illegal Seizure of Property**

63.     The Fourth Amendment to the United States Constitution prohibits unreasonable seizures of persons or property, and the Fourth Amendment is incorporated against the States by the Fourteenth Amendment. Persons violating

---

https://www.aclumich.org/en/news/aclu-michigan-urges-taylor-police-change-policy-and-training-after-violent-arrest-calvin-jones.

the Fourth Amendment under color of state law are liable at law and in equity under 42 U.S.C. § 1983.

64.     Defendants Dorflinger, Layne, and Hall, while acting under color of state law, violated Mr. Bryant's clearly established right to be free of unreasonable seizures by unlawfully seizing and impounding his dog on April 15, 2021.

65.     Specifically, Defendants had no warrant authorizing such a seizure and lacked reasonable suspicion and probable cause to believe that the dog seized from Mr. Bryant was being subjected to animal cruelty under any legal authority.

66.     Under 42 U.S.C. § 1983, municipal defendants are liable for their unconstitutional customs, policies, and practices.

67.     The unconstitutional acts of Defendants Dorflinger, Layne, and Hall were undertaken pursuant to, and proximately caused by, unconstitutional customs, policies, or practices of Defendant City of Taylor of criminalizing people with disabilities and allowing animal control officers to exert complete control over impounded animals while charging excessive fees for their owners to recover them.

68.     The unconstitutional customs, policies, or practices includes, but are not limited to, the City of Taylor's formal or tacit approval of its employees' conduct, deliberately indifferent failure to train its officers, and deliberately

18

indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivation and harm suffered by Mr. Bryant.

## COUNT II

### Illegal Seizure of Property
### in Violation of Article I, § 11 of the Michigan Constitution

69.    Michigan's Constitution prohibits the unreasonable seizure of one's possessions and property. Mich. Const. art. I, § 11.

70.    Officers Dorflinger, Layne, and Hall seized King without probable cause or a warrant.

71.    The City of Taylor is liable for the actions of Officers Dorflinger, Layne, and Hall because, under the Michigan Constitution, people who have been deprived of a constitutional right can seek redress through the courts even without a custom or policy.

72.    Cases that hold that there is no municipal liability under the Michigan constitution have reached this holding because municipalities can be held liable under 42 U.S.C. § 1983. However, there is no vicarious liability for municipalities under 42 U.S.C. § 1983. Because there is no claim for vicarious liability against the City of Taylor under 42 U.S.C. § 1983, the City of Taylor can be held vicariously liable under the Michigan Constitution.

## COUNT III

### Malicious Prosecution
### in Violation of Michigan Common Law
### and/or Mich. Comp. Laws § 600.2907

73.     Michigan law protects people from having criminal proceedings brought against them without probable cause and for a purpose other than bringing an offender to justice.

74.     Defendants Dorflinger, Layne, and Hall brought animal cruelty charges against Mr. Bryant without probable cause to believe that he was committing the crime of animal cruelty.

75.     Further, Defendants Dorflinger, Layne, and Hall did not bring the charges for the purpose of bringing an offender to justice. They brought the charges for the purpose of punishing Mr. Bryant for being "rude."

76.     There was no justification for charging Mr. Bryant with animal cruelty, and the matter was resolved in his favor.

77.     The actions of Defendants Dorflinger, Layne, and Hall deprived Mr. Bryant of his property for nearly four months and caused him great distress.

### DEMAND FOR RELIEF

Mr. Bryant requests that this Court:

a.     Assert jurisdiction over this matter;

b.     Award damages to Mr. Bryant, in an amount to be proved at trial;

c.      Enjoin Defendants from maintaining customs, policies, or practices of

the unconstitutional conduct alleged in this Complaint;

d.      Award Mr. Bryant costs and attorneys' fees; and

e.      Grant or award such other relief that this Court deems just and proper.

Respectfully submitted,

/s/ *Syeda F. Davidson*____
Syeda F. Davidson (P72801)
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund of
   Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6814
sdavidson@aclumich.org
mfancher@aclumich.org
dkorobkin@aclumich.org

/s/ *Jennifer M. Grieco*____
Jennifer M. Grieco (P55501)
Cooperating Attorney, American Civil
   Liberties Union Fund of Michigan
Altior Law, PC
401 S. Old Woodward Ave
Ste. 460
Birmingham, MI 48009
(248) 372-9884
jgrieco@altiorlaw.com

Attorneys for Plaintiff

Dated: September 1, 2022

## JURY DEMAND

Plaintiff demands a jury on all issues so triable.

Respectfully submitted,

/s/ *Syeda F. Davidson*
Syeda F. Davidson (P72801)
Mark P. Fancher (P56223)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund of
  Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6814
sdavidson@aclumich.org
mfancher@aclumich.org
dkorobkin@aclumich.org

/s/ *Jennifer M. Grieco*
Jennifer M. Grieco (P55501)
Cooperating Attorney, American Civil
  Liberties Union Fund of Michigan
Altior Law, PC
401 S. Old Woodward Ave
Ste. 460
Birmingham, MI 48009
(248) 372-9884
jgrieco@altiorlaw.com

Attorneys for Plaintiff

Dated: September 1, 2022